UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARYL WOODS, CDCR #H-43246,<br><br>Plaintiff,<br><br>vs.<br><br>DANIEL PARAMO; VICTOR ACOSTA; F. HADJADJ,,<br><br>Defendants. | Case No.: 3:17-cv-02595-CAB-WVG<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56**<br><br>[ECF No. 25] |

Daryl Woods ("Plaintiff"), a prisoner currently incarcerated at the Richard J. Donovan Correctional Facility ("RJD") located in San Diego, California, is proceeding pro se and in forma pauperis ("IFP") in this civil action pursuant to 42 U.S.C. § 1983.

**I.  Procedural History**

On February 15, 2018, the Court granted Plaintiff leave to proceed IFP pursuant to 28 U.S.C. § 1915(a) and found that Plaintiff's Complaint contained "free exercise of religion and equal protection claims sufficient to survive the 'low threshold' for proceeding past the sua sponte screening required by 28 U.S.C. §§ 1915(e)(2) and

1915A(b)."[1] (ECF No. 4 at 4 citing *Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012)). The United States Marshals Service ("USMS) was directed to serve Defendants Paramo, Acosta and Hadjadj with a copy of the Complaint and summons. (*See Id.* at 6.)

Defendants filed an Answer on April 24, 2018. (*See* ECF No. 11.) On March 7, 2019, Defendants filed a Motion for Summary Judgment pursuant to FED. R. CIV. P. 56. (*See* ECF No. 25.) Defendants notified Plaintiff of the requirements for opposing summary judgment pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc). (*See* ECF No. 25-7.) Plaintiff filed his Opposition to Defendants' Motion on June 7, 2019, to which Defendants filed their Reply. (See ECF Nos. 29, 30.) The Court also permitted Plaintiff to file a "Sur-Reply" on July 16, 2019. (*See* ECF No. 33.(

The Court has determined that this Motion is suitable for disposition upon the papers without oral argument and that no Report and Recommendation from Magistrate Judge William Gallo is necessary. *See* S.D. CAL. CIVLR 7.1(d)(1), 72.3(e).

Having carefully considered the record as submitted, the Court now GRANTS Defendants' Motion for Summary Judgment.

## II. Factual Background

### A. Plaintiff's Claims

Plaintiff was transferred from Wasco State Prison ("WSP") to RJD on August 8, 2017. (*See* Compl., ECF No. 1 at 4.) When Plaintiff was previously housed at WSP, he was "approved for Kosher diet." (*Id.*) CDCR regulations provide, in part, that "inmates who are transferred shall have the ability to continue participation in their current religious diet program at the receiving institution barring medical needs or other extraordinary circumstances." (*Id.* citing CAL. CODE. REGS. TIT. 15, § 3054(c).)

---

[1] Page numbers for all documents filed in the Court's Case Management/Electronic Case File ("CM/ECF") will refer to the pagination generated by CM/ECF as indicated on the top right-hand corner of each chronologically-numbered docket entry.

Plaintiff alleges that RJD "has a practice/custom to violate this mandate with all transferred prisoners on religious diets." (*Id.*) Plaintiff further maintains that "Chaplain Hadjadj is not adhering to section 3054(c) and continuing diets upon transfer." (*Id.*) Instead, Hadjadj is "requiring prisoners to go through the entire approval process again." (*Id.*) Plaintiff was "required to fill out a new CDCR 3030 form for Kosher diet, even though the Statewide Computer System ("S.O.M.S.") notifies RJD officials of approved diets." (*Id.*)

Plaintiff alleges he was "denied a Kosher meal for 27 days." (*Id.*) Plaintiff submitted a grievance to Hadjadj and "CRM Brown[2]" on August 9, 2017 "but was not placed on Kosher diet" until September 4, 2017. (*Id.*) Plaintiff was "limited on what he could eat to not offend religious principles." (*Id.*) He claims Warden Paramo had been "made aware of these long delays but failed to take action." (*Id.*) As a result, Plaintiff was "forced to eat bread and water for 3 weeks." (*Id.*)

Plaintiff further claims that "he was denied equal protection of similarly situated [prisoners] who transfer to prisons already approved for Kosher diet and allowed to continue in a reasonable fashion." (*Id.* at 5.) Moreover, he alleges Paramo "has repeatedly been advised of this problem and extensive delays but he has to date failed to address it at all." (*Id.*)

Plaintiff seeks injunctive relief in the form of an injunction preventing Defendants from "delaying provision of Kosher diets upon transfer for extensive periods," along with compensatory and punitive damages "to be determined." (*Id.* at 8.)

### III. Motion for Summary Judgment

Defendants seek summary judgment on the grounds that: (1) they did not violate Plaintiff's rights under the First Amendment; (2) they did not violate Plaintiff's rights under the Fourteenth Amendment Equal Protection Clause; (3) they are entitled to

---

[2] Brown is not a named Defendant in this action.

3

qualified immunity; and (4) Plaintiff lacks standing to request injunctive relief. (*See* Defs.' Memo. of Ps&As in Suppl. of Mot. for Summ J., [hereafter "Defs.' Memo. of P & As"] ECF No. 25-1, at 7.)

### A. Standard of Review

Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed.R.Civ.P. 56(c)) If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Id.* at 324.

To avoid summary judgment, the non-moving party is "required to present significant, probative evidence tending to support h[is] allegations," *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citations omitted), and must point to some evidence in the record that demonstrates "a genuine issue of material fact [which], with all reasonable inferences made in the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing Fed.R.Civ.P. 56; *Celotex*, 477 U.S. at 323). The opposing party cannot rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).

### B. First Amendment Free Exercise claim

"The right to the free exercise of religion is a precious American invention, distinguishing our Constitution from all prior national constitutions." *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993). "The right to exercise religious practices and beliefs does

not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987). The protections of the Free Exercise Clause are triggered when prison officials burden the practice of an inmate's religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008); *Freeman v. Arpaio,* 125 F.3d 732, 737 (9th Cir. 1997), *overruled in part by Shakur*, 514 F.3d at 884-85.

A prison regulation or policy that might otherwise unconstitutionally impinge on an inmate's First Amendment rights will survive a First Amendment challenge, however, if it is "reasonably related to legitimate penological interests." *See Turner v. Safley*, 482 U.S. 78, 89 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987). In determining whether a prison regulation is reasonably related to a legitimate penological interest, the court considers the following factors: (1) whether there is a valid, rational connection between the regulation and the interest used to justify the regulation; (2) whether prisoners retain alternative means of exercising the right at issue; (3) the impact the requested accommodation will have on inmates, prison staff, and prison resources generally; and (4) whether the prisoner has identified easy alternatives to the regulation which could be implemented at a minimal cost to legitimate penological interests. *Turner*, 482 U.S. at 89-90; *Shakur*, 514 F.3d at 884.

### 1. Defendant Paramo

In Plaintiff's Complaint, he contends that Warden Paramo "failed to act/stop and prevent wrongs alleged" by failing to "comply [with] Section 3054." (ECF No. 1 at 2.) He further alleges that Paramo "failed to take action" after he was "made aware of these long delays." (*Id.* at 4.) These allegations arise from Plaintiff's claims that various prison officials at RJD were not complying with CDCR regulation § 3054 which is the section governing the CDCR's "Religious Diet Program." CAL. CODE. REGS. TIT. 15, § 3054. More specifically, Plaintiff is claiming that RJD prison officials failed to

comply with § 3054(c) which provides, in part, that "[i]nmates who are transferred shall have the ability to continue participating in their current Religious Diet Program at the receiving institution." *Id.* at § 3054(c).

In support of their Opposition, Defendants have provided portions of Plaintiff's deposition transcript. (*See* Defs.' P&As, Declaration of Michelle Des Jardins in Supp. of Mot. for Summ. J., ECF No. 25-2 [hereafter "Pl.'s Dep."], Ex. 1.) In addition, Defendant Paramo has submitted a declaration signed under penalty of perjury. (*See* Defs.' P&As, Declaration of D. Paramo in Supp. of Mot. for Summ. J., ECF No. 25-5 [hereafter "Paramo Decl."])

It is clear from Plaintiff's allegations in his Complaint that he is seeking to hold Warden Paramo liable in his supervisory capacity. (*See* Compl. at 2, 3.) "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). A person deprives another of a constitutional right under section 1983, where that person "'does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made.'" *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). The "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743-44. There is no respondeat superior liability under § 1983; therefore, a supervisor, like Paramo, may be held liable for the constitutional violations of her subordinates only if she "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In his deposition, Plaintiff was asked if he sent "anything to the Warden." (Pl.'s Dep. at 63:14.) Plaintiff responded that he did not. (*Id.* at 63:17.) In addition, Plaintiff was asked if he spoke with the Warden about the issue of the delay and he replied that he

did not speak with the Warden about that issue. (*Id.* at 63:16-17.) When asked "why do you contend he was aware of your delay in receiving a kosher diet," Plaintiff responded "[b]ecause [Paramo] should be aware of the people under him what they're doing." (*Id.* at 63:18-21.) Plaintiff also stated that Paramo is "above everybody" and "the boss" and "should know what is going on at his own institution." (*Id.* at 63:21-23.)

Paramo states in his declaration that "Donovan did not have a practice or policy of requiring inmates to reapply for a Kosher diet upon transfer to Donovan." (Paramo Decl. at ¶ 2.) Paramo further states that he "never received any correspondence from [Plaintiff] concerning a Kosher diet." (*Id.* at ¶ 3.) Finally, he declares that he was familiar with the CDCR regulations regarding religious diets and "had no reason to believe that the chaplain, food services personnel, or any other staff were ignoring any regulations pertaining to religious diets." (*Id.* at ¶ 2.)

Plaintiff points to no evidence in the record to demonstrate that Paramo was at all aware of his claims. Instead, Plaintiff argues in his Opposition that Paramo "knowing the serious implications of Mr. Woods' allegations/charges did not 'man up' to individual or collective responsibility – no 'Harry S. Truman – the buck stops here." (P.'s Opp'n, ECF No. 29 at 9.) Plaintiff does not present any evidence to raise a genuine issue of a dispute of a material fact that Paramo personally participated in the purported violation of Plaintiff's constitutional rights.

Accordingly, Defendant Paramo's Motion for Summary Judgment as to all of Plaintiff's claims against him is **GRANTED** pursuant to Fed.R.Civ.P. 56.

### 2. Defendant Acosta

There are even fewer facts relating to Defendant Acosta in Plaintiff's Complaint. On page two of Plaintiff's Complaint, he lists Acosta as a Defendant and indicates that he is the "Food Services Manager at RJD responsible for processing and handling all foods, diets, meals." (Compl. at 2.) He further claims that Acosta "failed to comply with state regulation section 3054." (*Id.*) However, in the body of Plaintiff's Complaint there are no specific factual allegations as to how Acosta was aware of Plaintiff's claims or that he

was personally involved in the purported violation of Plaintiff's constitutional rights.

Plaintiff was asked in his deposition if he had ever spoken to Defendant Acosta and Plaintiff replied, "I think he was the guy in the kitchen." (Pl.'s Dep. at 66:23-25.) He elaborated by saying he told Acosta "Man, you can tell the food manager that, hey, my stuff is here. I've been talking to Hadjadj." (*Id.* at 67:2-3.) Plaintiff indicated that he believed that Acosta was the "free cook" and "looked Asian" to him. (*Id.* at 67:7-11.) Plaintiff further testified that he did not file a grievance with Acosta and Acosta did not respond to any of his grievances. (*Id.* at 9-22.)

Acosta has submitted a declaration in which he testifies that he is the "Correctional Food Manager I" and he works in the "administrative area of [RJD's] central kitchen." (*See* Defs.' P&As, Declaration of Acosta in Supp. of Mot. for Summ. J., at ¶ 2, ECF No. 25-4 [hereafter "Acosta Decl."])

Acosta maintains that he is neither a cook nor is he Asian as described by Plaintiff. (*Id.* ¶ 3.) He further declares that he does not "typically interact with the inmate population" and works in the "central kitchen." (*Id.*) The central kitchen is "not attached to a chow hall or to a prison yard." (*Id.*) The kosher meals are "taken from the central kitchen to the yards for distribution to inmates who are on the kosher diet list." (*Id.*) In addition, Acosta indicates that the distribution is "handled by someone other" than himself. (*Id.*)

Acosta declares that Plaintiff "never spoke" with him regarding his kosher diet. (*Id.* at ¶ 4.) He further maintains that he "had no knowledge of [Plaintiff's] need for a kosher diet until he was placed on the kosher diet list that was provided for Food Service, after which he received kosher meals." (*Id.*) Moreover, Acosta had "no authority to place an inmate on a kosher-diet list." (*Id.* at ¶ 5.)

Plaintiff's Opposition offers no admissible evidence to dispute Acosta's demonstration that he was not involved in the decisions to provide Plaintiff with a kosher diet nor has Plaintiff offered any evidence that he ever spoke with Acosta regarding his kosher diet. In his Opposition, Plaintiff instead suggests that Acosta, without evidentiary

support, is involved in a "scam" to mix "kosher with non-kosher food packages." (See Pl.'s Opp'n at 12.)

The Court finds there is no evidence in the record that would show there to be a direct connection between Defendant Acosta and Plaintiff's purported delay in receiving a kosher diet. "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (1996). Moreover, in order for the Court to find a genuine issue of material fact regarding whether Plaintiff's constitutional rights were violated, there must be the "requisite causal connection" in which there is "some kind of direct personal participation in the deprivation" or that can be shown by "setting in motion a series of acts by other which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson*, 588 F.2d at 743-44. Here, there is no evidence in the record to raise a triable issue of material fact that would link the purported failure to provide Plaintiff with a kosher diet to Defendant Acosta.

Accordingly, Defendant Acosta's Motion for Summary Judgment as to all of Plaintiff's claims against him is **GRANTED** pursuant to FED.R.CIV.P. 56.

### 3. Defendant Hadjadj

Plaintiff's allegations against Defendant Hadjadj involve Hadjadj's alleged failure to immediately provide Plaintiff with a kosher diet upon his arrival at RJD in violation of CDCR's regulations. (*See* Compl. at 4.) Plaintiff also claims it violated his First Amendment rights when Hadjadj required Plaintiff "to go through the entire [kosher meal] approval process again." (*Id.*)

CDCR regulations provide, in part, that "inmates who are transferred shall have the ability to continue participation in their current Religious Diet Program at the receiving institution barring medical needs or other extraordinary circumstances." CAL. CODE. REGS. TIT. 15, § 3054(c)). It is undisputed that Plaintiff had been approved for a kosher diet when he was previously housed at WSP. (*See* Pl.'s Compl. at 4; Hadjadj Decl. at ¶ 5; Defs.' P&As at 23.)

At issue in this matter is not the constitutionality of § 3054(c) itself but rather whether there is a genuine issue of material fact as to whether Hadjadj intentionally failed to comply with this regulation allowing Plaintiff to continue with a kosher diet immediately upon his transfer causing an alleged violation of Plaintiff's First Amendment rights.

In his declaration, Hadjadj declares that he "does not have a policy of requiring all inmates to re-apply for a religious diet when they transfer" to RJD. (Hadjadj Dec. at ¶ 3.) He further declares that he first received Plaintiff's request for a kosher diet in August of 2017. (*Id.* at ¶ 5.) Plaintiff had been transferred to RJD on August 8, 2017. (*See* Pl.'s Compl. at 4.) On August 9, 2017, Plaintiff submitted an "inmate/parolee request" indicating that he "was getting kosher at Wasco, I practice Jewish faith in a slightly different way." (*Id.*, Ex. "Inmate/Paroleee Request for Interview, Item or Service, CDCD 22, dated Aug. 9. 2017.") Hadjadj responded to this request, on August 15, 2017, stating "[p]lease provide proof/document of your previous approval." (*Id.*) Plaintiff responded to this request on August 23, 2017 stating that he would send his "original" approval. (Pl.'s Dep. at 45:1-5.) Plaintiff does not dispute that his request was ultimately granted and he began to receive his kosher meals on September 4, 2017. (*Id.* at 54:20-24.)

Plaintiff alleges in his unverified Complaint that Hadjadj had a policy of "not adhering to Section 3054(c) and continuing diets upon transfer" but instead "requiring prisoners to go through the approval process again." (Pl.'s Compl. at 4.) Hadjadj declares that he followed the regulation and did "not have a policy of requiring all inmates to re-apply for a religious diet when they transfer to [RJD]." (Hadjadj Decl. at ¶ 3.) Plaintiff offers no admissible evidence to dispute Hadjadj's declaration but rather relies on conclusory statements.

However, Hadjadj declares that he "checked CDCR's electronic inmate file for [Plaintiff] and did not see an approved Form 3030 for a kosher diet." (*Id.* at ¶ 5.) He did see the initial denial of a kosher diet for Plaintiff on November 17, 2016 at WSP but

states he "did not realize that there was another updated copy of the November 17, 2016 Form 3030 in which a [WSP] official had later checked off 'approved' at the bottom of the form next to the box where they had previously checked off 'denied.'" (*Id.*) As a result, it is undisputed that Hadjadj "asked [Plaintiff] to fill out a new Form 3030 so that I could verify his eligibility for one." (*Id.* at ¶ 6; Pl.'s Dep. 45:1-12.) On August 29, 2017, Plaintiff resubmitted the form requesting a kosher diet and on September 4, 2017, Plaintiff began receiving a kosher diet. (Hadjadj Decl., Ex. 4, Religious Diet Program Request, CDCR 3030 dated Aug. 29, 2017; Compl. at 4.)

The Ninth Circuit has held that it is constitutional for an institution to require that an inmate complete an application in order to receive a kosher meal. *See Resnick v. Adams*, 348 F. 3d 763, 771 (9th Cir. 2003). Plaintiff's receipt of a kosher diet was delayed by a period of less than thirty days but Plaintiff provides no evidence that the delay was intentional or that it was unnecessarily prolonged. Moreover, Plaintiff can point to no authority that the brief delay was unconstitutional. *See e.g. Green v. Paramo* 2018 WL 6062359, at *4 (S.D. Cal. Nov. 20, 2018) (five month delay in processing religious diet application not unconstitutional); *Taylor v. Pelican Bay*, 2010 WL 2671989 at *8 (N.D. Cal. July 2, 2010) (two month delay in processing religious diet not unconstitutional even after plaintiff was previously approved for a religious diet at another prison and required to participate in verification process.)

Accordingly, Defendant Hadjadj's Motion for Summary Judgment as to Plaintiff's claims First Amendment claims against him is **GRANTED** pursuant to FED.R.CIV.P. 56.

### C. Fourteenth Amendment Equal Protection claims

Defendants move for summary judgment of Plaintiff's equal protection claims. (*See* Defs.' Memo of Ps & As at 27-28.) "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 472 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause of the Fourteenth

11

3:17-cv-02595-CAB-WVG

Amendment protects prisoners from intentional discrimination based on their religious beliefs. *Freeman*, 125 F.3d at 737, *overruled in part by Shakur*, 514 F.3d 884-85. "Prisons must afford an inmate of a minority religion 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Id.*, quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). Prisons are required to "make good faith accommodation of the (prisoner's) rights in light of practical considerations." *Freeman*, 125 F.3d at 737, quoting *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987).

In order to support a discrimination claim, Plaintiff is required to demonstrate that prison officials intentionally acted in a discriminatory manner. *Freeman*, 125 F.3d at 737, citing *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991). In order to defeat summary judgment, Plaintiff "'must set forth specific facts showing that there is a genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths and that such conduct was intentional." *Freeman*, 125 F.3d at 737, quoting FED.R.CIV. PRO. 56(e).

Defendants maintain that Plaintiff has failed to allege that "Defendants intentionally discriminated against him because of his membership in a protected class or that they intentionally treated him differently than other inmates at [RJD] without a rational relationship to a legitimate state purpose." (Defs.' Memo of Ps & As at 27-28.) In fact, Defendants argue that Plaintiff actually alleges that Defendants applied a policy to all inmates requiring them to all re-apply for religious diets even if they had been approved at a different institution prior to arriving at RJD. (*Id.* at 28.) However, in his unverified Complaint, Plaintiff appears to allege that while he was not permitted to continue his kosher diet when he was first transferred to RJD, other inmates were "allowed to continue in a reasonable fashion." (Compl. at 5.) This contradicts his earlier assertion that there was a blanket policy to deny all incoming inmates the right to continue to have kosher meals.

1 Plaintiff offers no admissible evidence, nor does his point to any evidence in the record, to support this assertion that he was treated differently than any other inmate. Instead, he seems to provide exhibits in support of his allegations in his opposition, which are not contained in his Complaint, that other inmates kosher diets were denied for a variety of reasons. These exhibits, even if they were admissible, would not in any way support his unsupported conclusory assertion that he had been discriminated against. Thus, the Court finds that Plaintiff has failed to point to any evidence in the record to support his conclusory allegation, or to raise a triable issue of material fact, that Defendants intended to discriminate against any inmates by purportedly failing to implement a policy allowing an inmate to continue to receive a kosher diet following a prison transfer. *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Defendants' Motion for Summary Judgment as to Plaintiff's equal protection claims is **GRANTED**.

### D. Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity. Because the Court has found no triable issue of fact exists to show Plaintiff's constitutional rights were violated by Defendants, it need not reach any issues regarding qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

/ / /
/ / /
/ / /
/ / /
/ / /

## IV. Conclusion and Order

For all the reasons explained, the Court:

**GRANTS** Defendants' Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56. (ECF No. 25.) The Clerk of Court is directed to enter judgment for the Defendants and close the file.

**IT IS SO ORDERED**.

Dated: August 2, 2019

Hon. Cathy Ann Bencivengo
United States District Judge